**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JERRY ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08-CV-1347 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jerry Anderson claims that he was discriminated against on the basis of his race when the Defendant, the Chicago Transit Authority, failed to promote him to Bus Maintenance Manager II from 2005 to 2008. He also claims that the failure to promote him was retaliation for prior EEOC activity and that Defendant transferred him to less desirable work facilities in retaliation for this EEOC activity. Defendant has filed a summary judgment motion [28] on all of Anderson's claims. For the following reasons, the Court grants in part and denies in part Defendant's motion [28].

**I.      Background**

Plaintiff Jerry Anderson, an African-American male, has been employed by the Chicago Transit Authority ("CTA") since November 1985 and has been a Bus Garage Maintenance Manager ("BMM I") for over six years. At the time that Anderson began his employment with the CTA, he had an associates degree in transportation and auto/diesel technology. During his tenure at the CTA, Anderson earned a Bachelor of Arts in telecommunications management as well as a Masters in Business. He also has computer certifications as a Cisco Network Associate and as a Microsoft-Certified Professional. Since the CTA hired Anderson in November 1985 as

a part-time bus servicer, the CTA has promoted Anderson five times: to full-time bus servicer in January 1986; to bus repairman in March 1987; to bus maintenance foreman in February 1989; to bus maintenance pool manager in September 1999; and to BMM I in August 2002.

## A. Failure to Promote

Since 2005, Anderson has been applying for a promotion to Bus Garage Maintenance Manager II ("BMM II"). The CTA employs ten BMM IIs – one at each of the eight bus garages, one at the South Shops location, and one in Quality Control. BMM IIs are responsible for planning, supervising, and coordinating vehicle maintenance programs and activities. The education requirement for the BMM II position, as listed in the posting for the position, is "Bachelor's Degree or a combination of education and experience relating to areas of responsibility." Anderson applied or interviewed for the BMM II positions that were posted by the CTA on January 18, 2005, July 21, 2006, and January 19, 2007, but was turned down each time.

The stated process followed by the CTA in considering candidates for promotion to the BMM II position was as follows: (1) Dennis Milicevic, General Manager of Bus Operations, identified vacancies and communicated with William Mooney, Vice President of Bus Operations, regarding whether to post the position; (2) as requested by Mooney, the Human Resources department ("HR") posted the positions internally and externally for approximately two weeks; (3) an HR recruiter collected the internal and external applications and resumes; (4) the recruiter provided Milicevic with the applications and resumes after the posting closed; (5) Milicevic reviewed the applications and resumes and determined which candidates were best qualified to be interviewed according to a set of criteria provided by Mooney; (6) the candidates considered best qualified according to the set criteria were invited to interview for the position;

(7) Milicevic would confirm a representative number of general managers to interview; (8) Milicevic would work with the general managers to develop questions for the interviews; (9) candidates were interviewed individually by the panel of general managers; (10) each candidate was asked the same questions; (11) each interviewer individually graded each candidate's answers; (12) the grades given each candidate by each interviewer for each of the interview questions were totaled and then the grades each candidate received from all interviewers were averaged; (13) Milicevic reviewed this information with Mooney; and (14) the candidates with the highest scores from the interviews were offered a promotion to BMM II, as approved by Mooney. In addition to the foregoing, for the July 21, 2006 posting, the candidates were required to have either a four-year post-secondary degree or a plan to work toward one.[1] When Ron Huberman became CTA president on May 1, 2007, Huberman rescinded the educational directive, and BMM IIs promoted after that date did not have to meet that educational requirement.

While Anderson admits that the preceding is the CTA's "stated" procedure, he contends that this procedure was not followed by the CTA for him. Anderson contends that (i) Milicevic failed to give Anderson the proper number of points when determining whom to interview; (ii) the scores on Anderson's interview sheet were changed; and (iii) Anderson was given a low score by one interviewer who was not even in the room for two of the questions asked.

With respect to the January 2005 BMM II posting, Anderson filed a timely application, which was considered. According to the CTA, due to a clerical error, Anderson's Maintenance Manager Pool experience was not counted in determining whether he had the requisite five years

---

[1] Mooney informed the BMM Is who reported to him about the need to pursue an educational degree because in the summer of 2005, Frank Kruesi, at the time the president of the CTA, gave Mooney a verbal directive that anyone considered for a General Manager position – a position higher than the BMM II position – was required to have a four-year post-secondary degree.

of manager experience to be interviewed for the January 2005 posting. The CTA interviewed Todd Horbach and Gary March, who are both Caucasians and who were both in the Pool Managers Program with Anderson in September 1999, but the CTA did not interview Anderson. John Murphy (Caucasian), Randal Meyer (Caucasian), and Gary March (Caucasian) were promoted from the January 2005 posting. According to Anderson, in June 2005, he met with Mooney to discuss why he had been passed over for the January 2005 promotion. After reviewing his resume, Anderson alleges that Mooney told him that not many African Americans had accomplished what he had and that these accomplishments may be his "Achilles heel." Mooney denies making this statement.

On August 16, 2006, Anderson read an e-mail from Dennis Milicevic to Terrence Muellner, which voiced Milicevic's disappointment that a number of BMM Is had not applied for the July 21, 2006 BMM II posting and specifically stated "can anybody tell me why we have not heard from Anderson." Anderson claims he applied online prior to the August 3 deadline and then again after reading Milicevic's e-mail. According to Anderson, he had been assured by HR that applying online was the best way to apply. Defendant contends that Anderson did not apply online prior to the August 3 deadline, but concedes that he did apply online on August 19, after the deadline. Anderson also claims that he followed up by sending an e-mail to Milicevic on August 18, 2006, indicating that he had applied online and expressing his continued interest in the position. HR recruiter Chawn Jackson informed Milicevic that she had checked the online applications on August 18, 2006, and that Anderson had not applied online. In any event, Milicevic was aware that Anderson either had applied or intended to apply for the July 2006 posting, and Milicevic told Jackson that he would have Anderson submit a late application. According to the CTA, Jackson inadvertently missed Anderson's application because she did not

check the online applications for the position after August 18, despite Milicevic's comment that he would accept Anderson's late application. Anderson was not considered or interviewed for this position, although a CTA representative testified that the CTA could consider late applicants and had done so in the past. John Ward (Caucasian), Chris Chaney (African American), and Michael Griswold (African American) were promoted from the 2006 BMM II posting. According to Anderson, at the time Ward was promoted, he did not have a Bachelor's degree, although he was expected to continue his education until he received one.

In evaluating candidates for the January 19, 2007 posting, the CTA dropped the requirement that a candidate have a maximum of five years of BMM I experience. Anderson was interviewed from the January 2007 posting. The CTA maintains that because he ranked eleventh out of seventeen interviewees for the January 2007 posting, Anderson was not recommended for the position. Anderson claims that the interview scores for him and Arthur Laski, a Caucasian, were changed after the interview, and that Anderson was given a low score for two questions by one interviewer who left the room while he was answering those two questions. Arthur Laski (Caucasian), John Malatesta, Jr. (Caucasian), and Jeff Jurek (Caucasian) were promoted from the January 2007 BMM II posting. Laski neither possessed a college degree nor was enrolled in college at the time he was promoted. According to Anderson, Laski wrote on his resume that his projected date to get a bachelor of business administration degree from Strayer University was 2011, yet Laski has not even enrolled in that college. Jeanette Martin, one of the interviewers for the January 2007 posting, stated during her deposition that if she had known that Laski was not enrolled yet, she would have deemed his representation on his resume to be a "falsification" and a "serious matter." Mooney testified that Milicevic did not inform him that Laski was not enrolled at Strayer and that he would have considered this fact

before approving Laski's promotion. Anderson had worked at the CTA for seven years longer than Laski and had more experience as a manager than Laski.

Following a restructuring of the CTA's Maintenance Operations in January 2008, three more BMM Is (two Hispanics and one African American) were promoted to BMM IIs. All three BMM Is promoted previously had performed as Acting BMM IIs, while Anderson had not. For these promotions, the openings were not posted. Terrance Muellner, the CTA's Chief Mechanical Officer, chose not to go through the four to six month posting and interview process because he needed to make promotions quickly to meet the "Maintenance Operations Performance Management" goals set by the CTA President. At the time the promotions were made, Muellner did not know that Anderson had filed an EEOC charge.

Chris Chaney, one of Anderson's supervisors, testified that he felt Anderson was qualified to be a BMM II. Chaney testified that Anderson was a "performer" at Chaney's location, but also stated, "I understood * * * through my conversations with him that his performance may have been called into question at other locations; and when we talked about that I think it wasn't a result of his inability to do it more than maybe his attitude about being passed over and just not being motivated to really perform at the level that he could." During the time Anderson worked with Chaney, he created computer-generated spreadsheets for other managers to use. According to Anderson, the CTA found the database helpful and wanted to use it at different locations, but he refused.

B. Transfers

During the relevant time period, William Mooney has final authority regarding BMM I transfers, and Richard Swanson, General Manager at Quality Maintenance North, assisted in determining rotations for BMM Is to the various garages. BMM Is are assigned to work at

various locations based on need, and as indicated on the job posting for a BMM I position, the "location" for this posting is "various." Of the eighty-five BMM Is who were transferred to different garages from February 1, 2007 to December 31, 2008, thirty-four were African American, thirty-five were Caucasian, fifteen were Hispanic, and two were Asian. Of the eighty-five, six (four African Americans and two Caucasians) were transferred three times, and eighteen (nine Caucasians, seven African Americans – including Anderson – and two Hispanics) were transferred two times. From January 2005 to the present, Anderson was transferred four times: from 77th Street Garage to Kedzie Garage on October 30, 2005,[2] from Kedzie Garage to Chicago Avenue Garage on August 27, 2006, from Chicago Avenue Garage to North Park Garage on July 15, 2007, and from North Park Garage to 74th Street Garage in early August 2007. Anderson's last two transfers occurred after he filed his EEOC claim.

According to Anderson, and, to a certain extent, confirmed by other CTA employees, North Park Garage was considered the worst garage in the system due to, among other things, the age of the facility, the equipment, its outdoor location, and demanding customers. For the three weeks that Anderson was at North Park, he was assigned as the Pump Manager during the night shift, which Anderson considered a low-level position.[3] According to William Rafferty, the BMM II at North Park when Anderson was transferred, Anderson was assigned to Pump

---

[2] Anderson testified that when he began working at Kedzie Garage, Terrance Muellner, a Caucasian BMM II, told Anderson that he did not want him at that garage and that Art Laski would be his "right hand man." According to Anderson, Muellner directed Anderson not to give any orders to a Caucasian employee – Nick Rodusta – who worked under Anderson, and then asked Anderson to write up Darryl Lloyd, an African American bus repairman, so that Laski would not appear racist. Anderson never wrote up Lloyd, but Lloyd did receive discipline from Laski, Muellner, and Ray Delgadillo, another BMM I at Kedzie Garage. Muellner and Laski deny Anderson's claims. Anderson was never disciplined while he worked at Kedzie Garage.

[3] During the time that Anderson worked at North Park, the three BMM Is who worked the day shift were Derrick Smith, Steve Durham, and Lincoln Harris (all African Americans).

Manager because it was the only open BMM I position at the garage. Rafferty did not know that Anderson had filed an EEOC charge in January 2007.

## C. Procedural History

On January 28, 2007, Anderson filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination against the CTA because he was not promoted to BMM II from 2005 through January 2007.[4] Anderson received a right-to-sue letter dated January 22, 2008, and filed his two-count complaint in this Court on March 6, 2008. In Count I, Anderson alleges race discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, because he was not promoted to BMM II beginning in January 2005, despite having a sufficient educational background and more experience and qualifications than non-African American employees whom the CTA promoted to BBMII. In Count II, Anderson alleges that the CTA retaliated against him after he filed his charge with the EEOC, by continuing to refuse to promote him and instead promoting others less qualified, by transferring him to different garages, and by giving him an assignment at one garage that was below his education and experience levels. According to Defendant (and not contested by Anderson), the following individuals had no knowledge, prior to this lawsuit, that Anderson had filed a charge with the EEOC in January 2007: Donald Bonds, Villetta Chatman, Mary Beth Cobleigh-Beal, Raymundo Delgadillo, Rogelio Garza, Patti Hoyle-Heavens, Chawn Jackson, Arthur Laski, Patrick Loftus, Jeanette Martin, William Mooney, Terrance Muellner, William Rafferty, Richard Swanson, Robert Takagi, and Jesus Vega. Dennis Milicevic was aware during the relevant time period that Anderson had filed a charge with the EEOC complaining that he had not been promoted.

---

[4] The CTA has an internal Equal Employment Opportunity area ("EEO") that investigates claims of discrimination and harassment. In March 2000, Anderson contacted the internal EEO, but he did not contact the EEO regarding his complaints about not receiving a promotion.

## II.    Analysis

### A.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in

employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

### B. Plaintiff's Title VII Race Discrimination Claim

Anderson claims that Defendant discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act and the ADEA. Title VII prohibits discrimination in employment: "It shall be an unlawful employment practice for an employer * * * to discharge any individual because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prove a case of discrimination under Title VII, a plaintiff may show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (explaining the misleading nature of this nomenclature and reiterating that the direct method may be proven with either direct or circumstantial evidence and that the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)). Under the direct method of proof, the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. *Id.*; see also *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Dandy v. United Parcel*

*Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001)).

Under the indirect method of proof initially set forth in *McDonnell Douglas Corp. v. Green,* a plaintiff first must establish a *prima facie* case of discrimination. 411 U.S. 792, 802-04 (1973). In order to establish a *prima facie* case of race discrimination, a plaintiff must establish that: (1) he was a member of a protected class; (2) he was qualified for the job or was otherwise meeting the defendant's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. See *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 538 (7th Cir. 2007).

If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); see also *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Fane*, 480 F.3d at 538.

1.    *The January 18, 2005 Posting*

Any claim based on the three promotions from the January 18, 2005 posting – two that occurred on May 15, 2005, and one that occurred no July 12, 2005 – are administratively barred since all of the postings occurred prior to April 3, 2006, which is 300 days before Anderson filed his EEOC charge on January 28, 2007. See 42 U.S.C. § 2000e-5(e)(1) (a charge of employment discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (Title VII bars

"discrete acts of discrimination or retaliation that occur outside the statutory time period"); see also *Roney v. Ill. Dept. of Transp*., 474 F.3d 455, 460 (7th Cir. 2007). As explained by the Supreme Court in *Morgan,* "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." 536 U.S. at 113. A promotion, like other discrete acts of alleged discrimination, is an unlawful employment practice that must be brought to the EEOC's attention within 300 days of its occurrence. *Id*. at 114; see also *Jackson v. City of Chicago*, 552 F.3d 619, 623 (7th Cir. 2009). Because Anderson waited more than 300 days after he was not promoted from the January 2005 posting to file an EEOC charge, his promotion claim related to that posting is time-barred.[5] However, under *Morgan*, Anderson is not barred from using untimely acts as background evidence in support of other timely claims. See *Morgan*, 536 U.S. at 113 (untimely acts may still be used as "evidence in support of a timely claim").

### 2. *Direct Evidence*

The only direct evidence of discrimination that Anderson has put forth is an alleged comment by Mooney in June 2005 that not many African Americans had accomplished what Anderson had and that these accomplishments may be his "Achilles heel." Anderson contends that this creates an inference that his supervisors might be threatened by a well-educated African American man. First, this comment cannot be used as evidence of direct discrimination with respect to the January 2005 posting because, as discussed previously, his claim related to this posting is time-barred. While it could be used as background evidence to support his timely claims, Mooney's alleged comment was made more than a year before both the July 2006

---

[5] Title VII's filing requirement is subject to the doctrines of equitable tolling and estoppel (see *Morgan*, 536 U.S. at 113); however, Anderson does not invoke them in support of his argument that his demotion claim was timely filed.

posting and the January 2007 posting. The Seventh Circuit has concluded that a decisionmaker's comment made more than a year before an adverse action fails to constitute evidence of discrimination under the direct method. See *Hemsworth v. Quotesmith.Com, Inc*., 476 F.3d 487, 491 (7th Cir. 2007) (concluding that president's comment that the employee who had suffered a stroke looked tired and old was not sufficient evidence of discrimination because comment was made more than a year before employee's termination); see also *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (decisionmaker's comment to plaintiff that "[a]s long as you keep acting like a man, you will get places," made more than a year before plaintiff's termination, failed to constitute evidence of discrimination under the direct method). Furthermore, Anderson has not presented any evidence that Mooney harbored any animosity toward him; rather, Anderson admitted that he frequently met with Mooney to discuss concerns over not being promoted, during which time Mooney assisted him with interviewing skills, and Anderson also admitted that Mooney considered any employee who obtained a post-secondary degree to have made a great achievement. *Cf. Stephens v. Erickson*, 569 F.3d 779, 788-89 (7th Cir. 2009) (finding no retaliation where plaintiff did not produce sufficient evidence to show that supervisor harbored any animosity toward him). The "Achilles heel" comment is therefore insufficient to point directly to a discriminatory reason for the CTA's failure to promote Anderson.

## 2. *Prima Facie Case*

For the remaining two promotions (July 21, 2006, and January 19, 2007), Anderson clearly meets the first and third prongs of the *prima facie* test, as he is a member of a protected class who suffered an adverse employment action when the CTA failed to promote him on at least three occasions. See *Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838 (7th Cir. 2008)

("A cognizable adverse employment action is a 'significant change in employment status, such as * * * failing to promote'") (quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)).  As to the second prong of the *prima facie* case, there is at least a material question of fact as to whether Anderson was qualified for the BMM II position or was otherwise meeting the CTA's legitimate performance expectations.  The CTA initially argued that Anderson could not have been interviewed for the first two postings because he did not have the required five years manager experience.  However, the CTA has since retracted this argument as Anderson pointed out that he should have been given credit for his time in the Maintenance Manager Pool – as Caucasian employees were.  The CTA instead argues that Anderson cannot meet the second prong for the July 2006 posting[6] because the evidence shows that he did not timely apply for the position and failed to follow the usual procedures in applying late.  However, because Anderson claims that he timely applied and that he followed the observed procedures in applying late, a question of fact exists as to whether he applied for and was qualified for the July 2006 posting, and Anderson has satisfied the second prong with respect to the two remaining postings at issue.

With respect to the January 2007 posting, the CTA argues that Anderson cannot establish the fourth prong because his responses to the interview questions indicated that he was not as qualified for the promotion as those who were promoted.  However, the CTA determined that Anderson was qualified to be interviewed.  Furthermore, Anderson has alleged problems with or inconsistencies in the interviewers' scoring, such as altered scores and certain interviewers leaving the room during his interview yet still giving him poor marks for those questions.  At the summary judgment stage, these allegations suffice to establish the fourth prong of the *prima facie* test with respect to the January 2007 posting.  Thus, Anderson has established a *prima facie* case of discrimination with respect to the July 2006 and January 2007 postings.

---

[6]  The CTA does not contend that Anderson failed to meet the second prong for the January 2007 posting.

### 3.     Pretext

Since Anderson has successfully established a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the CTA to articulate a legitimate, non-discriminatory reason for failing to promote him.   The CTA claims that a legitimate, non-discriminatory reason for not promoting Anderson from the July 2006 posting is that the CTA did not receive his application in a timely fashion.   As for the January 2007 posting, the CTA claims that the other candidates simply interviewed better, and thus were scored higher, than Anderson.

To avoid summary judgment, Anderson must prove by a preponderance of the evidence that this proffered reason is pretextual.   A plaintiff shows that a reason is pretextual "directly by persuading the court that a discriminatory reason more likely motivated the [defendant] or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).   An employer's decision to promote is pretextual when "it is a lie – a phony reason meant to cover up a disallowed reason.   Otherwise, an employer's decision to favor one candidate over another can be 'mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed those reasons, pretext has not been shown.'"   *Id*. (quoting *Millbrook v. IBP, Inc*., 280 F.3d 1169, 1175 (7th Cir. 2002)).   In order to establish pretext, a plaintiff must show that the defendant's articulated reasons for its decision (1) had no basis in fact; (2) did not actually motivate the defendant's decision; or (3) were insufficient to motivate the actions.   *Hughes v. Brown*, 20 F.3d 745, 747 (7th Cir. 1994).   A plaintiff must "*specifically refute facts which allegedly support the employer's proffered reasons*"; conclusory statements

about an employer's prejudice are insufficient to establish pretext. *Alexander v. CIT Tech. Fin. Servs., Inc.*, 217 F. Supp. 2d 867, 890 (N.D. Ill. 2002) (emphasis in original).

Anderson clearly believes that he was qualified for the BMM II promotions for which he was passed over. However, "'a plaintiff's own opinions about [his] work performance or qualifications do not sufficiently cast doubt on the legitimacy of [his] employer's proffered reasons for its employment actions.'" *Brown v. Illinois Dept. of Natural Resources*, 499 F.3d 675, 684 (7th Cir. 2007) (citing *Millbrook*, 280 F.3d at 1181). Instead, there must be additional evidence that demonstrates pretext, beyond whether a defendant made accurate, wise, or well-considered employment decisions. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered").

The CTA's proffered reason for not promoting Anderson to the first two postings (the first of which – the January 2005 posting – does not form the basis of a claim but rather serves only as background evidence) was that he did not have the requisite minimum five years experience to be interviewed for either of these positions. Then, when the CTA realized that they had in fact interviewed two Caucasians with the same amount of experience as Anderson, the CTA's reason shifted to claiming that Anderson was not considered for the second posting because it never received his application (and no additional reason was offered for the first posting). This inconsistency calls into question whether the CTA's articulated reasons for not promoting Anderson are the actual reasons worthy of belief or are in fact mere pretext. *Cf. Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 (7th Cir. 1999) (under Seventh Circuit case law, a "changed story is evidence of pretext, and entitles [a plaintiff] to a trial on the issue of the reason for his termination); *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 634 (7th

Cir. 1996) (failure to express non-discriminatory explanation earlier despite several opportunities to do so gives rise to inference that later expressed reason is pretextual). This evidence, taken together and viewed in the light most favorable to Anderson, indicates that the CTA's explanation for why it did not promote him may not have been the "real" reason for its decisions, and could be construed by a jury as evidence of pretext.

Furthermore, Anderson claims that he submitted both a timely application and also a second, late application, as directed by Milicevic. The CTA, in its own statement of facts, asserts that Milicevic told HR recruiter Jackson that he was willing to accept a late application from Anderson. Def. SOF ¶ 49. In light of evidence that it was routine to submit applications online, a jury may question the CTA's explanation that its HR person did not check her computer for e-mails and applications when she was told that an applicant would be submitting a late application. And, at a minimum, both sides agree that Anderson submitted an application by August 19 at the latest, that late applications could be considered, that Anderson's late application was to be considered, and that the interviews did not occur until the end of September 2006. Viewing these facts in the light most favorable to Anderson – that either a timely application was submitted or his late application should have been considered – also casts doubt on whether the CTA's proffered reason for not promoting Anderson was the "real" reason.

With respect to the January 2007 posting, the CTA claims that other candidates interviewed better, and thus were scored higher, than Anderson. The CTA cites *Wilson v. Nicholson*, 2009 WL 458613, at *4 (N.D. Ill. Feb. 24, 2009), in support of its motion for summary judgment, in which this Court stated, "Wilson appears to be an experienced, well-regarded employee; however, he has not presented any evidence that the same descriptions do not apply equally (or more so) to Carter [and] [a]ccordingly, Plaintiff has not met his burden of

proving that Defendant's articulated legitimate, nondiscriminatory reason for promoting Carter over Plaintiff was a pretext." However, unlike the plaintiff in *Wilson*, in this case, Anderson has presented objective evidence that he was more qualified, in terms of education and experience, than Caucasian employees selected ahead of him. The CTA correctly points out that to create an inference of discrimination based upon a difference in credentials, Anderson must offer more than "mere self-serving appraisals" or his own subjective belief that he was as qualified as the successful application. *Hall v. Forest River, Inc.*, 536 F.3d 615, 620 (7th Cir. 2008). However, differences in qualifications can demonstrate pretext where those differences "are so favorable as to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Milbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002).

In this case, at the time that John Ward (Caucasian) was promoted from the July 2006 posting, he did not have a Bachelor's degree, although he was expected to continue his education until he received one. Anderson had earned a Bachelor of Arts in telecommunications management as well as a Masters in Business. More glaring, at the time that Arthur Laski (Caucasian) was promoted from the January 2007 posting, Laski neither possessed a college degree nor was enrolled in college. Not only did Anderson have more education than Laski, he also had worked at the CTA for seven years longer than Laski and had more experience as a manager than Laski. Taken with Anderson's allegations that (i) his interview scores were altered for the worse and Laski's changed for the better, and (ii) an interviewer left the room during his interview and gave him 1 out of 5 possible points for the two questions she missed, a jury could infer that the CTA's explanations were not the real reason for its failure to promote Anderson from the January 2007 posting.

### C. Plaintiff's Title VII Retaliation Claim

Anderson also sued the CTA for retaliation, claiming that the CTA continued not to promote him and transferred him to a less desirable garage in retaliation for filing an EEOC charge on January 28, 2007. Under the anti-retaliation provision of Title VII, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." *Brown*, 499 F.3d at 684 (quoting 42 U.S.C. § 2000e-3(a)). "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted). "Under the direct method, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.* at 663 (quotations and citations omitted). Alternatively, under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show that (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action. See *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 560 (7th Cir. 2004). "'If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action.'" *Tomanovich,* 457 F.3d at 663 (quoting *Adusumilli v. City of Chicago,* 164 F.3d 353, 362 (7th Cir. 1998)). Then, if the employer presents evidence of a non-discriminatory reason for its employment action, "'the burden shifts back to the plaintiff to demonstrate that the

employer's reason is pre-textual.'" *Id.* (quoting *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 903 (7th Cir. 2005)).

Anderson has failed to demonstrate that the transfers were retaliation for filing an EEOC charge. As acknowledged by Anderson, transfers are part of a BMM I's job. The location for the BMM I position as stated on a BMM I posting is "various," and BMM Is are assigned to work at various locations. For instance, as Anderson admits, of the eighty-five BMM Is transferred to different garages from February 1, 2007 to December 31, 2008, thirty-four were African American, thirty-five were Caucasian, fifteen were Hispanic, and two were Asian. Six of the eighty-five BMM Is were transferred three times, and Anderson was one of eighteen who were transferred two times. Furthermore, as Anderson also admits, the two individuals responsible for BMM I transfers – Richard Swanson and William Mooney – did not know that Anderson had filed an EEOC charge. Furthermore, Anderson was only at North Park Garage – which he considers to be the worst garage in the system – for three weeks. William Rafferty, the BMM II at North Park, did not know that Anderson had filed an EEOC charge six months earlier, and Rafferty testified that he assigned Anderson to the BMM I Pump Manager position at North Park because that was the only position open at the time. Anderson was not assigned to the day shift – the position that he wanted – because for the three weeks that he was there, those positions already were filled (incidentally, by three African American BMM Is). See *McKenzie v. Milwaukee County*, 381 F.3d 619, 625-26 (7th Cir. 2004) (transfer does not become an adverse employment action solely because the employee subjectively prefers one position over another). These facts, even viewed in the light most favorable to Anderson, do not support a claim that Anderson was transferred as retaliation for filing an EEOC charge.

Anderson also maintains that the CTA retaliated against him for filing an EEOC charge by failing to promote him from the January 2007 posting. Anderson has demonstrated that after filing his EEOC charge in late January 2007, he was not promoted to BMM II from the January 2007 posting.[7] He also has demonstrated that he was performing his job satisfactorily and that similarly situated, Caucasian employees who did not file a charge were promoted. Furthermore, Dennis Milicevic, who was intricately involved in the promotion process, knew that Anderson had filed an EEOC charge.

The CTA's non-discriminatory reason for not promoting Anderson is that he did not answer the interview questions as well as the three individuals who were promoted. However, based on the record and drawing all inferences in Anderson's favor, a jury may believe that the CTA's stated reason is pre-textual. Anderson has presented objective evidence that he was more qualified, in terms of education and experience, than at least one of the Caucasian employees selected ahead of him. As set forth earlier with respect to Anderson's discrimination claim, differences in qualifications can demonstrate pretext where a plaintiff clearly is more qualified for a position than an applicant outside the protected class, such that a reasonable juror could infer discriminatory intent from the comparison. See *Milbrook*, 280 F.3d at 1180. At the time that Arthur Laski (Caucasian) was promoted from the January 2007 posting, Laski neither possessed a college degree nor was enrolled in college. Anderson had more education than Laski, had worked at the CTA for seven years longer than Laski, and had more experience as a manager than Laski. Furthermore, there is at least a question of material fact regarding whether Laski was completely truthful on his application. Taken with Anderson's allegations that interview scores were altered and that an interviewer who had left the room during Anderson's interview gave him poor scores for the questions that she missed, a jury could infer that the

---

[7] The interviews for the January 2007 posting were conducted in June 2007.

CTA's stated reason was not the real reason for its failure to promote Anderson from the January 2007 posting and instead was retaliation for filing an EEOC charge.[8]

## III.    Conclusion

For the foregoing reasons, Defendant's motion for summary judgment [28] is granted in part and denied in part.  Plaintiff's discrimination claims with respect to the July 2006 and January 2007 postings remain pending, while his discrimination claims with respect to any transfers or to the other BMM II postings are dismissed.  Plaintiff's retaliation claim with respect to the January 2007 posting remains pending, while the remaining retaliation claims are dismissed.

Dated:  January 22, 2010

_____
Robert M. Dow, Jr.
United States District Judge

---

[8]  In Anderson's opposition to the CTA's motion for summary judgment, Anderson failed to offer any argument regarding a discrimination or retaliation claim with respect to the promotions that followed a restructuring of the CTA's Maintenance Operations in January 2008.  When a party fails to address an argument in his summary judgment brief, it can be deemed a waiver.  See, *e.g.*, *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001) (finding that plaintiff waived retaliation claim by failing to argue retaliation before the district court in opposition to defendant's summary judgment motion); but see *Nabosny v. Podlesny*, 92 F.3d 446, 457 n.9 (7th Cir. 1996) (non-moving party's failure to raise an issue in response to summary judgment motion does not result in waiver).  However, even if Anderson had maintained that the CTA discriminated or retaliated against him in these promotions, the CTA has offered a legitimate business reason for its actions.  Terrance Muellner, the CTA's Chief Mechanical Officer, chose not to go through the four to six month posting and interview process because he needed to make promotions quickly to meet the "Maintenance Operations Performance Management" goals set by the president.  At the time that the promotions were made, Muellner did not know that Anderson had filed an EEOC charge.  And the three BMM Is promoted (two Hispanics and one African American) had performed previously as Acting BMM IIs, while Anderson had not.   In the face of these legitimate business reasons for not promoting him, Anderson bears the burden of demonstrating that these reasons are pretextual.  Anderson has failed to do so and thus cannot maintain a retaliation or discrimination claim with respect to the 2008 promotions.